**IT IS ORDERED as set forth below:**

**Date: February 27, 2019**

_____
**Paul Baisier
U.S. Bankruptcy Court Judge**

_____

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | : | CASE NO. **18-52419-PMB** |
| | : | |
| **GAIL SENIDA WOOD**, | : | |
| | : | CHAPTER 13 |
| Debtor. | : | |
| | : | |

**ORDER DENYING CONFIRMATION
OF DEBTOR'S PLAN WITH LEAVE TO AMEND**

This case came on for hearing before the Court on the confirmation of the Debtor's Chapter 13 Plan (Docket No. 56)(the "Plan") on November 8, 2018 (the "Hearing"). Counsel for the Debtor and counsel for Melissa J. Davey, the duly appointed Chapter 13 trustee in this case (the "Trustee"), appeared at the Hearing. No other creditors or parties in interest appeared at the Hearing or filed objections to confirmation of the Plan.

The Plan provides for monthly payments of $1,275.00 for an applicable commitment period of sixty months. The Plan provides for the cure of an arrearage on the Debtor's home loan

of $6,656.91. The Plan also provides for the payment of $9,806.00 for a domestic support obligation, $3,000.00 for the fees of the Debtor's attorney, and $4,201.00 for an amount the Debtor asserts she owes to the Internal Revenue Service (the "IRS"). After those priority claims are paid, the Plan proposes to pay "a pro rata portion of the larger of (1) the sum of $39,199.00 and (2) the funds remaining after disbursements have been made to all other creditors provided for in this [P]lan" to the nonpriority unsecured creditors of the Debtor.[1] Finally, the Plan provides that the Debtor's approximately $20,000.00 in student loans are in deferment and will be paid by the Debtor outside of the Plan.

At the Hearing, the Debtor and the Trustee agreed that the Plan is ready for confirmation, subject to the resolution of a single issue – whether the Plan complies with 11 U.S.C. § 1325(a)(4), otherwise known as the "best interest of creditors test."[2] The Debtor and the Trustee each filed a brief (each a "Brief") on this issue on November 30, 2018 (see Docket Nos. 68 and 69). Neither party filed a response to the Brief of the other (see Docket, *passim*).

The dispute regarding the "best interest test" results from the fact that the value of the Debtor's home substantially exceeds the sum of the liens secured by the home and the Debtor's exemption in the home – in other words, there is substantial "equity" in the Debtor's home. In such circumstances, to satisfy the "best interest test," the Debtor must pay to her nonpriority unsecured creditors an amount at least equal to what they would receive if the case was a case

---

[1] Based on the figures in the Plan and the claims filed to date in this case (see Claims Docket, *passim*), the amount to be paid to nonpriority unsecured creditors under the Plan will exceed the $39,199.00 figure, so long as all the Plan payments are made and the Plan is not modified to reduce the required payments. In fact, assuming the fee to the Trustee is 6%, nonpriority unsecured creditors should receive $48,246.09 under the Plan as currently constructed.

[2] Also called the "best interests of creditors test" or the "liquidation test." See W. Homer Drake, Jr., et al., CHAPTER 13 PRACTICE AND PROCEDURE § 7.6, fn.1 (2014–2 ed.).

2

under Chapter 7, the home was sold by the Chapter 7 trustee, the liens, exemption and other costs of sale were paid, and proceeds were distributed to creditors. The dispute in this case is precisely how that hypothetical calculation is to be conducted.

As noted previously, the Plan provides that the nonpriority unsecured creditors of the Debtor will receive, at minimum, a pro rata share of $39,199.00. The Debtor has $60,092.96 of such creditors based on filed claims,[3] meaning that those creditors will receive, at minimum, an approximately two-thirds distribution on their claims under the Plan. The Trustee asserts that, using an appropriate calculation, the required distribution to nonpriority unsecured creditors would exceed $60,092.96, and thus the Debtor must propose a plan that pays those creditors 100% to satisfy the "best interest test."[4]

At the Hearing and in the Briefs, the parties have raised a number of issues regarding the relevant calculation. In summary, they are:

1.  **Valuation**. What is the relevant date to value the home, and what is the value of the home on that date? The Debtor asserts that the Court must value the home as of February 12, 2018, the petition date in this case, and submits a value of $368,500.00 as of that date; the Trustee asserts that the appropriate valuation date is November 8, 2018, the date of the Hearing, and accepts the Debtor's July appraisal of $375,000.00 as the value for that purpose.

2.  **Costs of Sale.** How should the costs of sale be determined? The Debtor asserts that the Court should apply a 10% factor for costs of sale, and then also subtract the Chapter 7

---

[3] *See* Claims Docket, *passim*.

[4] Neither party asserted that the Debtor might have to pay through the Plan more than the absolute amount of the net that would be received from the hypothetical sale of the home, to reflect the delay in payment through a Chapter 13 plan, to satisfy the "present value" requirements of Section 1325(a)(4).

3

trustee's statutory commission. The Trustee asserts that the Debtor can either use a 6% brokerage commission for the costs of sale and add the actual Chapter 7 trustee commission, or use 10%, but cannot use both.

3. **Calculation of Chapter 7 Trustee's Commission**. The Debtor asserts that the Chapter 7 trustee's statutory commission under 11 U.S.C. § 326 would be charged on the gross sales price of the home, less the Debtor's exemption. The Trustee asserts that the commission should not be payable on amounts paid to holders of security deeds who would (or could) be paid by the closing attorney upon the sale of the home, rather than directly by the Chapter 7 trustee. The Trustee also subtracts the commission paid to the real estate broker before calculating the Chapter 7 trustee's commission.

4. **Deduction of Unfiled Priority Tax Claim.** The Debtor subtracts from her required payment the amount provided in the Plan to be paid to the IRS, which has not filed a claim in this case. The Trustee did not include such a deduction.

These issues are addressed below in turn.

### "Effective Date" and Valuation

For the Plan to be confirmed, 11 U.S.C. § 1325(a)(4) requires that:

> [T]he value, as of the effective date of the plan, of property to be distributed under the plan on account of each unsecured claim is not less than the amount that would be paid on such claim of the estate of the debtor were liquidated under Chapter 7 of this title on such date[.]

The term "effective date of the plan" is not defined in Title 11 of the United States Code (the "Bankruptcy Code"). Courts have generally taken two views as to the appropriate date in this

context. Some have held that the petition date is the effective date of the plan;[5] others have held that the date of the hearing on the confirmation of the plan is its effective date.[6] Unfortunately, few of the cases actually arise in the context of confirmation,[7] and even fewer contain any real analysis of the issue.

Two leading bankruptcy treatises also take opposite views. Citing only to a few of the cases taking the "filing date" view, *Collier on Bankruptcy* states that using the "filing date" is the most "logical and practical method for such valuation." 8 COLLIER ON BANKRUPTCY ¶ 1325.05[2][a] (A. Resnick & H. Sommer eds., 16th ed. 2018). It supports that conclusion through a discussion of some perceived difficulties in determining what property constitutes property of the estate and what exemptions might apply, as well as alleged burdens on the debtor associated with frequent postpetition amendments to the schedules, if a later date is used.[8] Even in its own explanation, however, *Collier* seems to acknowledge that the term "effective date of

---

[5] See e.g., CHAPTER 13 PRACTICE AND PROCEDURE § 7.9, n.6 (2014–2 ed.)(citing cases).

[6] See e.g., CHAPTER 13 PRACTICE AND PROCEDURE § 7.9, n.5 (2014–2 ed.)(citing cases).

[7] Most of them arise in the context of a later modification of a confirmed plan and concern the identification of the effective date in that context. See e.g., In re Guillen, 570 B.R. 439 (Bankr. N.D. Ga. 2017); In re Roberts, 514 B.R. 358 (Bankr. E.D. N.Y. 2014); In re Moran, 2012 WL 4464492 (Bankr. N.D. Tex. Sept. 25, 2012); Hollytex Carpet Mills v. Tedford, 691 F.2d 392 (8th Cir. 1982); In re Statmore, 22 B.R. 37 (Bankr. D. Neb. 1982).

[8] Although when interpreting statutes it may be appropriate to consider the practical ramifications of an interpretation to determine what was intended by Congress, where it is clear from the words used by Congress that a particular reading is required, it is not the province of the courts to fix the problems created by what Congress enacted by giving the words used by Congress a meaning that they cannot bear. That appears to be what *Collier* suggests be done here.

5

the plan" really means the date on which the plan is confirmed.[9] All in all, the analysis of this issue in *Collier* is hardly compelling.

In contrast, *Chapter 13 Practice and Procedure* states that "[logically], a plan's effective date cannot occur before it is confirmed." W. Homer Drake, Jr., et al., CHAPTER 13 PRACTICE AND PROCEDURE § 7.9 (2014–2 ed.). It goes on to observe that a proper analysis of the present value of the payments to be made under a plan would require a calculation as of the date when the plan payments begin— the confirmation date.[10] The treatise then concludes that, because the statute requires the date of hypothetical liquidation and the date of the present value determination to be the same,[11] the "effective date of the plan" must be the confirmation date.[12]

This Court agrees with *Chapter 13 Practice and Procedure* and finds that the "effective date of the plan," for the purposes of Section 1325(a)(4) of the Bankruptcy Code, is the date of the hearing on confirmation. It simply does not make sense that the term "effective date of the plan" could mean the petition date. First, the phrase itself suggests that the date must be a date on which

---

[9] In its discussion of this issue, *Collier* complains that it would be impractical for a debtor to have to amend her schedules "right up to the effective date of the plan," and notes that "although the effective date of the plan is usually the date the order of confirmation becomes final, the plan might provide for a later effective date." 8 COLLIER ON BANKRUPTCY ¶ 1325.05[2][a]. These statements are clearly inconsistent with the notion that the "effective date of the plan" is the petition date.

[10] Although payments by the debtor to the Chapter 13 trustee begin 30 days after confirmation, the initial distribution of plan payments by the trustee (other than adequate protection payments to secured creditors) is not made until confirmation. See 11 U.S.C. § 1326(a).

[11] *Collier*, by contrast, seems to say that these dates can be different. Given the plain statutory language that requires that the valuation be as of the "effective date," and the hypothetical liquidation also to be "on such date," it is not clear how any reasonable interpretation of those words could permit the dates to be different.

[12] The Chapter 13 treatise then goes on to debunk the reasons put forth in *Collier* for why a later date is problematic. All in all, the discussion of this issue in Section 7.9 of the Chapter 13 treatise is a compelling argument for the use of the confirmation date as the "effective date." *Norton Bankruptcy Law and Practice* also takes this position. See also 7 *Norton Bankruptcy Law and Practice* § 151:11 (3d ed. 2019).

the plan is effective. Since a plan is not otherwise binding or enforceable prior to the time it is confirmed,[13] selecting the petition date as the "effective date" is simply inconsistent with the words used by Congress to describe the target date. Second, Congress clearly knows how to identify the petition date in the bankruptcy context when it intends to use it as a date of determination.[14] There is no reason to think that Congress would use a different term for petition date in this context – especially one that seems by its plain meaning to call for the use of the different, later date. Finally, the phrase "effective date of the plan" is used in other contexts in the Bankruptcy Code and is never determined (or even considered) to be the petition date in any other context.[15] When Congress uses the same words in the same statute, it is generally presumed that those words will have the same meaning. See Ratzlaf v. U.S., 510 U.S. 135, 143, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994)("A term appearing in several places in a statutory text is generally read the same way each

---

[13] An unconfirmed plan is not binding on any party until confirmation; prior to confirmation, a plan merely represents a proposal by the debtor. See 11 U.S.C. § 1327(a) ("The provisions of a *confirmed plan bind the debtor and each creditor*, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.")(emphasis added).

[14] See e.g., 11 U.S.C. § 109(h)(1)(utilizing the "date of the filing of the petition" for determining the period in which a debtor must take a credit counseling course); 11 U.S.C. § 502(b)(allowance of claims is determined "as of the date of the filing of the petition"); 11 U.S.C. § 506(a)(2)(providing that the date for valuing personal property in consumer cases is the "date of the filing of the petition"); 11 U.S.C. § 545(2)(setting the time a statutory lien must be perfected as "at the commencement of the case"); 11 U.S.C. § 1308(a)(determination of the taxable years for which a debtor must file a return is based upon "the 4 year period ending on the date of the filing of the petition"); 11 U.S.C. § 1326(a)(4) (debtor must begin making certain payments "[n]ot later than 60 days after the date of filing of a case").

[15] The phrase is used in several other places in the Bankruptcy Code, mostly in connection with confirmation of Chapter 11 plans. See 11 U.S.C. § 1129(a)(7); 11 U.S.C. § 1129(a)(9)(A); 11 U.S.C. § 1129(a)(9)(B); 11 U.S.C. § 1129(b)(2)(A)(i)(II); 11 U.S.C. § 1129(b)(2)(B)(i); 11 U.S.C. § 1129(b)(2)(C)(i); 11 U.S.C. § 1225(a)(4); 11 U.S.C. § 1325(a)(5)(B)(ii). In none of these contexts is the phrase interpreted to identify a time prior to the confirmation of the plan. In fact, in discussing Section 1325(a)(5), and the meaning of the phrase "as of the effective date of the plan" as used therein, *Collier* itself takes the position that the effective date of the plan "will ordinarily be provided for by the plan," and can be the date the confirmation order becomes final. 8 COLLIER ON BANKRUPTCY ¶ 1325.06[3][b][i]. In its discussion of the meaning of the phrase in that subsection, *Collier* makes no mention of the possibility that the effective date of the plan might be the petition date.

time it appears."); Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)(refencing the "normal rule of statutory construction" that "identical words used in different parts of the same act are intended to have the same meaning.").

In view of the foregoing, the "effective date of the plan" in this case is November 8, 2018, the date of the Hearing. With regard to the evidence, the Debtor has presented an appraisal of the home as of two dates – February 12, 2018 ($368,500.00) and July 21, 2018 ($375,000.00). The Trustee is willing to accept the July 21 value as the value as of November 8, 2018. The two valuations presented by the Debtor suggest that the home has appreciated during 2018, such that the value as of November 8, 2018 may be in excess of $375,000.00. However, the Court will accept the valuation to which the Trustee stipulates and finds that the home was worth $375,000.00 as of the effective date of the Plan.

## Costs of Sale

The Debtor and the Trustee agree that it is appropriate to subtract a 6% brokerage commission from the value of the home in connection with this analysis. What they disagree about is what other costs should be subtracted. The Debtor asserts that an additional 4% should be subtracted to cover the other "costs of sale", including prorated taxes but excluding the statutory commission of the Chapter 7 trustee, which should be calculated and subtracted separately. The Trustee asserts that, if the 10% figure is used (6% brokerage plus 4% for other costs), it should include all other costs of sale, including the Chapter 7 trustee's statutory commission.

As noted by Judge Sacca in In re Guillen, 570 B.R. 439 (Bankr. N.D. Ga. 2017), the 10% deduction has been used in this District for decades as a proxy for the costs of sale, including the Chapter 7 trustee's commission. As Judge Sacca also observed, to the extent a 10% figure was

8

ever an accurate estimation of the costs of sale plus the Chapter 7 trustee's fee, it seems to have ceased to be so after the 1994 amendments to the Bankruptcy Code, when the Chapter 7 statutory fee was substantially increased. Id. at 450.[16]

It is true, as the Trustee notes, that the practice of using 10% as a proxy for all costs of sale has continued in this District after the 1994 amendments. Until now, however, the Court has not been asked to weigh in directly on its propriety. The practice seems obviously to undercount the actual fees and expenses that would be incurred in a Chapter 7 case if an actual sale of the property occurred and a basic Chapter 7 case were administered (and thus to overstate the amount a Chapter 13 debtor would need to contribute to their case to provide the equivalent amount to its nonpriority general unsecured creditors). More specifically, the parties have agreed that a 6% brokerage commission should be assumed. That would leave only 4% to absorb all other costs, including the other costs of sale (prorated taxes, recording fees and taxes, and other miscellaneous expenses), the Chapter 7 trustee's commission, as well as the professional fees that would necessarily be incurred by the Chapter 7 trustee to facilitate the sale and administer even a simple Chapter 7 estate. Four percent seems entirely inadequate to the task.

---

[16] Prior to the 1994 Amendments the commission was, for all intents and purposes, a flat 3% on disbursements. 11 U.S.C. § 326(a) (1993); see also 8 COLLIER ON BANKRUPTCY ¶ 326.LH[1][b][6] n.43 (explaining that under the pre-1994 version of Section 326(a), "trustees would receive fifteen percent on the first $1,000 or less, six percent on any amount in excess of $1,000 but not in excess of $3,000, and three percent on any amount in excess of $3,000.")(internal quotations omitted). After those amendments, the commission is calculated using a different sliding scale. More particularly, the current scale it is 25% of the first $5,000.00, 10% on amounts between $5,000.00 and $50,000.00, 5% of amounts over $50,000.00 but less than $1,000,000.00, and 3% over $1,000,000.00. See 11 U.S.C. § 326(a). There is substantial disagreement as to whether this is a cap or a fixed commission. See 8 COLLIER ON BANKRUPTCY ¶ 326.02[1][a] ("There has been disagreement for years as to whether section 326(a) simply sets an upper limit on the trustee's compensation, with no entitlement to the full amount implied or whether it is a straight commission not subject to adjustment."). However, for this purpose it seems inappropriate to consider the scale only as a cap, since the commission it results in can be charged in any case, and there is no basis for assuming a smaller commission will be charged in any individual, hypothetical case. But see In re Locklear, 386 B.R. 911, 914 (Bankr. S.D. Ga. 2007)(allowing only a 2% commission when the statutory formula was 8% because the formula is only a cap).

More particularly, based on the applicable commission schedule for Chapter 7 trustees set forth in Section 326, the commission on a house worth $1,000,000.00 or less (the vast majority of houses we consider) is not less than 5%, and can exceed 8%. Obviously, with that commission and a presumed 6% brokerage commission, a flat 10% deduction from the gross sales price cannot even cover all of the commissions due – brokerage and trustee – much less any of the other costs associated with a sale in a hypothetical Chapter 7 case.[17]

The Debtor agrees with this analysis and asserts that the Court should use the 10% figure for all other costs, and then also subtract the Chapter 7 trustee's commission. The Court finds that in this case, and likely in most cases, that would be too advantageous for the Debtor. As noted above, before the increase in the Chapter 7 trustee commission, the local practice was that 10% was an adequate deduction for all costs. This would include a 6% brokerage commission, a 3% trustee's commission and 1% for other miscellaneous costs. So, logically, if the Chapter 7 trustee's commission is now going to be considered separately, the assumed percentage for things other than that commission might reasonably be thought to be 6% for the brokerage commission plus the 1% for other expenses.

Since the 6% brokerage commission is assumed, the real question is whether 1% of the purchase price (in this case $3,750.00) is adequate to cover all of the "other" expenses associated with the sale and the case. It does not appear in this case that it is. The obvious items that would need to be paid from the 1% would include a proration of the real property taxes, the other closing

---

[17] This does, of course, assume that both percentages are calculated on the same base number, which is not precisely accurate as, for example, any relevant exemption would be subtracted from the figure upon which the statutory commission is calculated. However, given the method for calculating the Chapter 7 trustee's commission outlined *infra*, the numbers upon which the two commissions are calculated are sufficiently similar for the observation about the inadequacy of 10% of the gross sales price to cover both of them to remain accurate.

costs, as well as the professional fees (attorney and accountant) that the Chapter 7 trustee would incur in seeking approval to engage the broker, selling the property and otherwise administering the hypothetical Chapter 7 case.

In this case, the property taxes for the home are $4,211.69.[18] Prorated for a sale on November 8, 2018, they would equal $3,600.00. An additional $250.00 for miscellaneous closing costs, including filing and recording fees and expenses would seem reasonable. One (1) hour of attorneys' time for the engagement of the broker and another two and one-half (2.5) hours for the negotiation of the contract and the approval of the sale, for a total of three and one-half (3.5) hours, also seems minimally adequate. It is also reasonable to assume that the trustee's counsel would need to engage in a few additional hours of activity to permit the basic administration of the Chapter 7 case, including preparing for and conducting the 341 meeting, and preparing the trustee's final report and request for compensation. It would be reasonable to assume an additional two and one-half (2.5) hours for such activities. A median local rate for counsel in this District would be $350.00 per hour, such that a total of $2,100.00 in attorneys' fees would be reasonably incurred related to the sale and the general administration of the case. Engagement of an accountant to prepare a tax return and otherwise administer the estate would also be required. The Court would allow an additional $750.00 for that purpose. Considering these identifiable expenses, and in the absence of any other expenses associated with this sale, it would appear that

---

[18] No evidence was presented to the Court with regard to this amount. Instead, since the information appears necessary to make this determination, the Court determined to take judicial notice of the online records of the Fulton County, Georgia tax commissioner (www.fultoncountytaxes.org) regarding the tax status of the home.

11

subtracting $6,700.00 for costs of sale (exclusive of the real estate brokerage and Chapter 7 trustee's commissions) would be appropriate in this case.[19]

**Chapter 7 Trustee's Commission**

The Debtor asserts that the statutory commission to the Chapter 7 trustee pursuant to 11 U.S.C. § 326(a) that must be subtracted for the purposes of the hypothetical Section 1325(a)(4) liquidation in this case is $21,038.75.[20] The Trustee asserts that, to the extent the Chapter 7 trustee commission is relevant as a separate matter, it is $7,896.30. As noted previously, the Section 326(a) commission is calculated as 25% of the first $5,000.00, 10% on amounts between $5,000.00 and $50,000.00, 5% of amounts over $50,000.00 but less than $1,000,000.00, and 3% over $1,000,000.00. It is not the commission scale that is in dispute in this case, however, but the amount to which it is to be applied.

The Debtor asserts that the commission scale should be applied to distributions of $355,775.00 (the sales price of $375,000.00 minus the Debtor's exemption of $19,225.00). Conversely, the Trustee asserts that the commission scale should be paid on only $92,926.00. The difference between the two figures is that the Trustee subtracts the first and second priority secured

---

[19] As a general rule of thumb, although 4% in addition to the real estate brokerage commission for all other costs of sale (excluding the Chapter 7 trustee's commission) seems too generous, an additional 2% would in most cases be appropriate – or, said differently, the parties would be reasonable in subtracting 8% plus the actual Chapter 7 trustee's commission (calculated pursuant to 11 U.S.C. § 326(a)), in doing this hypothetical calculation. See e.g., Locklear, *supra*, 386 B.R. at 914 (noting the variance in calculating the costs of sale percentages determined by bankruptcy courts in the 11 U.S.C. § 326 context and finding a 6% cost of sale plus a statutory fee of 2% for the Chapter 7 trustee for a total "blended percentage" of 8%); In re Dixon, 140 B.R. 945, 947 (Bankr. W.D. N.Y. 1992)(utilizing a 10% cost of sale approach which took into account real estate commission of 7%, the Chapter 7 trustee's attorneys' fees of 1%, and other miscellaneous costs of sale such as title searches and survey costs, as well as transfer taxes, totaling 2%).

[20] The Debtor actually asserted in her Brief a slightly smaller figure, $20,713.00, based on the lower February 12, 2018 value of the home that she asserted was applicable. This figure is adjusted to reflect the applicable value of the home found *supra*.

12

claims ($240,349.00) and the real estate commission ($22,500.00) from his commissionable disbursements. We will address these disputes in turn.

*Secured Claims*

The Trustee asserts that it is not necessary for a Chapter 7 trustee to distribute the proceeds of a sale of real estate to creditors with a security interest in such property, since those funds can be (and typically are) distributed directly to the secured creditor by the closing agent at closing. Although the Trustee describes the process of disbursement accurately, it does not follow from that description that the Chapter 7 trustee is not entitled to a commission on those funds. In fact, the statutory language in Section 326(a) is precisely to the contrary. It contemplates the payment of the statutory commission "upon all moneys disbursed or turned over in the case by the trustee to parties in interest . . . *including holders of secured claims*." 11 U.S.C. § 326(a)(emphasis added). Since the trustee is the party selling the real property, and the closing agent is acting as her agent in paying the secured creditors, it appears perfectly clear that Congress intended that the Chapter 7 trustee was meant to earn a commission on monies distributed to secured creditors at closing.[21]

The Trustee tries to avoid this result by asserting that under 11 U.S.C. § 330(a)(1)(A), the Court would, in the hypothetical Chapter 7 case at issue here, refuse to allow a Chapter 7 trustee to earn a commission on payments to secured creditors because the distribution of the funds by the Chapter 7 trustee would not be "necessary." This of course ignores the express inclusion of payments to secured creditors in the calculation of the commission in Section 326(a), which certainly suggests that Congress believes it is "necessary" for Chapter 7 trustees to make

---

[21] See e.g. Guillen, *supra*, 570 B.R. at 451 (adding back secured creditor distributions to calculate Chapter 7 trustee commission); Locklear, *supra*, 386 B.R. at 914 (calculating Chapter 7 trustee commission without subtracting monies paid to secured creditor).

13

distributions to secured creditors. Further, that argument and its focus on the necessity of the Chapter 7 trustee making the actual distribution suggests that that the Trustee views the commission as compensating the Chapter 7 trustee solely for distributing funds, when the compensation at issue is really a commission for managing, liquidating, and distributing the assets of the estate, the value of which is measured by the somewhat crude proxy of distributions. Clearly the size of the estate that is managed, and upon which the commission is earned, is measured more accurately when the proceeds of the secured creditor's security are included. In view of the foregoing, the Court will not subtract the two secured claims in the case from the sales proceeds in determining the Chapter 7 trustee's commission for the purposes of the hypothetical Chapter 7 liquidation analysis conducted in this case under Section 1325(a)(4).

*Real Estate Commission*

The Trustee does not explain why she excludes the real estate commission from the amounts upon which the commission is earned. In the absence of such an explanation, and because the realtor is certainly at least a "party in interest" in the case to whom a distribution is made, the real estate commission will not be subtracted in determining the Chapter 7 trustee's commission for the purposes of the hypothetical Chapter 7 liquidation conducted in this case under Section 1325(a)(4). See 8 COLLIER ON BANKRUPTCY ¶ 326.02 [1][e] (discussing whether disbursements include payments for administrative expenses).

In view of the inclusion of the secured creditor and brokerage commission proceeds in disbursements, the Chapter 7 trustee's commission in the hypothetical liquidation analysis is $21,038.76, rounded to $21,039.00.

*IRS Claim*

The Trustee does not subtract the claim of the Internal Revenue Service to get to the amount the Debtor must pay.  She does not do so because the IRS has not filed a claim in this case (see Claims Docket, *passim*) and because the August 11, 2018 deadline for the filing of government proofs of claim has passed.  See Docket No. 9.

It is true that the IRS has not filed a claim in this case.  However, under the facts of this case, that is not determinative for this analysis.  The Debtor initially filed this case on February 12, 2018, *pro se*.  See Docket No. 1.  In her initial filings, she did not list any priority unsecured claims.  Id.  She also did not list the IRS as a creditor in her list of creditors.  Id.  As a result, the IRS did not get initial notice of this case.  Debtor's counsel joined this case in May 2018.  Docket Nos. 24 and 25.  Counsel amended the Debtor's schedules to include the IRS in September 2018, after the bar date.  Docket No. 44.  He also amended her then-proposed plan to provide for the claim in full (Docket No. 48) and served that plan on the IRS (Docket Nos. 59 and 60).  The current Plan provides for that same treatment.  Clearly the Debtor believes that such a priority claim exists.[22]  Based on the foregoing, the IRS has a reasonable excuse as to why its claim was not filed timely.[23]  Further, so long as the IRS files a claim in a hypothetical Chapter 7 case before the final distributions are made, they would still come ahead of all general unsecured claims.  11 U.S.C. §§ 726(a)(1), (a)(2).  Consequently, they will be counted in full in this analysis.

---

[22] The Debtor has attached to its Brief two out of ten pages of an unsigned IRS Form 5564 (pages 1 and 7), which appears to suggest that the IRS has information that shows that the Debtor underestimated her 2016 income tax on her return by $4,201.00.  The Form is dated August 16, 2018.

[23] The IRS might argue successfully that they are entitled to an extension of time to file a proof of claim in light of the facts of this case under Federal Rule of Bankruptcy Procedure 3002(c)(6).

## **CONCLUSION**

Based on the foregoing, the Court concludes that for her Plan to comply with 11 U.S.C. § 1325(a)(4), the Debtor must commit to pay $51,184.00 or more to nonpriority unsecured creditors. That amount is calculated as $375,000.00 less $22,500.00 (realtor commission), $6,700.00 (other costs of sale), $19,225.00 (exemption), $240,348.00 (secured claims), $9,803.00 (DSO claim), $4,201.00 (IRS claim) and $21,039.00 (Chapter 7 trustee's commission). Her current Plan pays slightly less than $40,000.00 on such claims.

Accordingly, in light of the foregoing, it is hereby

**ORDERED** that confirmation is **DENIED**, as the current Plan does not comply with 11 U.S.C. § 1325(a)(4); and it is further

**ORDERED** that the Debtor shall have thirty days from the entry of this Order to amend her Plan to make an adequate provision for nonpriority unsecured creditors as described herein; and it is further

**ORDERED** that if the Debtor files an amended Plan that only amends the Plan to make the adequate provision referenced in the prior paragraph, the Court may confirm that amended Plan without further notice or a hearing; and it is further

**ORDERED** that if an amended Plan that complies with this Order is not filed by the Debtor within thirty days of the date of this Order, this case may be dismissed without further notice or a hearing upon the filing of a supplemental report to that effect by the Trustee.

The Clerk is directed to serve a copy of this Order upon the Debtor, counsel for the Debtor, the Chapter 13 Trustee, and all parties on the matrix in this case.

**[END OF DOCUMENT]**